IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

CHARLES CHRISTIAN,
 JOHN DOE RS-01, and
 JOHN DOE RS-02,

     Plaintiffs,

v.

REGENTS OF THE UNIVERSITY OF
MICHIGAN,

    Defendant.

CASE NO. 2:20-cv-11294

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiffs allege that Defendant violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, as set forth below.

This case has common issues of law and fact with other cases presently pending in this district, including John Doe MC-1 v. The University of Michigan, Regents of the University of Michigan, Case 2:20-cv-10568-VAR-EAS.

## INTRODUCTION

1.    Plaintiffs are male former student-athletes who attended the University of Michigan ("UM", the "University", and "Michigan") and were sexually assaulted by Robert E. Anderson, M.D. ("Anderson"), a physician who worked for UM.

2.    By no later than 1979, UM knew Anderson was sexually assaulting male UM students during their medical appointments with him. UM disciplined Anderson by transferring him to the University's Athletic Department, where he was

named team physician for several of Michigan's intercollegiate teams, including the football, wrestling, and hockey teams. Anderson remained in the Athletic Department for 24 years. UM never protected Plaintiffs from Anderson, never warned Plaintiffs about Anderson's history of sexually abusing patients, and never indicated that Anderson was anything other than an excellent sports medicine physician. Not once did Michigan try to protect Plaintiffs from Anderson, monitor Anderson during examinations, notify law enforcement authorities about Anderson's actions, notify the state medical board, or ask Plaintiffs what Anderson did when he examined them.

3.      Plaintiffs bring their claim under Title IX now, rather than decades ago when the abuse occurred, because not until February 2020 did they learn (1) they had been sexually abused by Anderson, and (2) the University had known all along Anderson was a sexual predator. Not until February 2020 did Plaintiffs have a reasonable basis to suspect that Anderson's sexual abuse of them had been something other than a doctor's legitimate choice of medically acceptable examination techniques.  Not until February 2020 did Plaintiffs have reason to believe that UM had knowingly placed them under the medical care and protection of a known sexual predator, or that UM would hide from them the shocking truth about how Anderson had previously abused male patients.

4.      Plaintiff Charles (Chuck) Christian's suffers from inoperable and terminal prostate cancer. He learned he had cancer in 2016 and has already outlived his prognosis of a three-year life expectancy. During Christian's four physical exams with Anderson at Michigan, Anderson digitally inserted multiple fingers into Christian's rectum and moved his hand and fingers in a way that was painful. Looking back, Anderson's proposed purpose of checking Christian's prostate was a ruse. In legal terms, "rape" is the word that accurately describes what Anderson did to Christian those four different occasions. Because these exams hurt so much, Christian refused digital rectal exams during his adult physicals. Christian's terminal condition is therefore a direct and proximate result of the University putting him in Anderson's exam room, despite knowing Anderson was a serial sexual predator, and Anderson raping Christian.

5.      When the University announced it was going to set up a system to resolve claims from Anderson's victims, Plaintiffs hoped they could avoid filing suit against their alma mater. Indeed, in multiple media reports and, ironically, in a motion to dismiss the claims of other abuse victims seeking justice, Michigan's representatives have publicly and proudly professed that now, decades after the fact, Michigan truly wants justice for the victims of Anderson's abuse and the University of Michigan's cover-up.

6.     Plaintiffs' optimism was short-lived. The University's words quickly proved hollow. Counsel for Christian recently invited the University to discuss a possible settlement between Christian and the University. This way, Christian could leave his affairs in order for his wife, his three children, and his seven grandchildren. The University declined to discuss settlement with Christian. Despite all the compassionate words of its Michigan's President, the Chairman of its Regents, and Michigan's lawyers (who were simultaneously urging the court to throw out the lawsuits of other victims), and despite knowing Christian will soon die from a cancer that directly follows from the rapes Anderson committed and Michigan caused and then covered up, the University slammed the door shut on Christian. It now appears very unlikely that Christian shall obtain justice from the University before he dies.

7.     John Does 1 - 2 have filed anonymously in this action due to the highly personal and sensitive nature of the circumstances giving rise to their claims.

## I.     JURISDICTION AND VENUE

8.     The Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 because their claims arise under the laws of the United States.

9.     Venue is proper in this District under 28 U.S.C. § 1391(a)–(d) because, *inter alia*, substantial parts of the events or omissions giving rise to the claim

occurred in this District and/or a substantial part of property that is the subject of the action is situated in this District.

10.     Anderson treated the Plaintiffs in Ann Arbor, Michigan, which is in this District.

11.     UM is located within this District. The acts and omissions of UM administrators that form the basis for Plaintiffs' Title IX claim occurred in this District.

## II.     PARTIES

### A.     Facts Common to All Plaintiffs

12.     Plaintiffs were enrolled as students at UM while Anderson was working in Michigan's Athletic Department as a team physician.

13.     Plaintiffs participated in UM intercollegiate sports teams while enrolled at UM.

14.     Plaintiffs received financial assistance from UM that was linked to their participation on UM's intercollegiate sports teams.

15.     Plaintiffs were honored to represent the blue and maize in competitive sports and did their best to continue the University's tradition of athletic and academic excellence.

16.     Plaintiffs attended UM reasonably expecting the University would consistently provide them with a safe and supportive environment that would help them perform at their best, both athletically and academically.

17.     Plaintiffs reasonably believed that UM would make patient/athlete safety one of the University's primary concerns.

18.     Physicians hold a relationship of trust and confidence with their patients.

19.     Plaintiffs reasonably trusted UM to act in their best interests, or at least use reasonable care, when selecting, training, supervising, and disciplining the team physicians it employed.

20.     Plaintiffs trusted UM to hire physician faculty members who would respect and honor the relationship of trust and confidence that must be present between patients and their physicians.

21.     Plaintiffs trusted UM to regularly and competently evaluate the quality and integrity of the medical services its team physicians, including Anderson, provided to the athletes under their care.

22.     Plaintiffs trusted UM to investigate faithfully all circumstances that indicated a team physician might be unfit to treat Plaintiffs, whether due to acts of sexual assault, abuse, or incompetence.

23.     Plaintiffs reasonably trusted UM to prohibit doctors accused of sexually abusing their patients from continuing to treat UM students and athletes unless and until such accusations were thoroughly investigated and determined to be false or unfounded.

24.     Plaintiffs trusted that UM administrators in a position to take corrective measures regarding Anderson would not hide, fail to disclose, or disregard information the University held that raised a substantial likelihood the Plaintiffs or other students and student-athletes would be sexually assaulted, abused, or harassed by Anderson.

25.     Plaintiffs reasonably expected UM, an esteemed institution of higher learning, would investigate allegations of misconduct by Anderson in a timely and competent manner, regardless of how unfavorable findings might affect the University's reputation or athletic programs.

26.     Plaintiffs relied on UM to prevent, confront, and stop Anderson' sexual abuse of Plaintiffs and other male UM students.

**B.     Facts Specific to Individual Plaintiffs**

27.     Plaintiff Charles Christian is a resident of the State of Massachusetts and a United States citizen.

28.     Christian attended UM as an undergraduate student from 1977 to 1981. Christian attended Michigan on a football scholarship and graduated from Michigan with a bachelor's degree in fine arts.

29.     Christian played football for Michigan all four years he attended the University.

30.     Anderson treated Christian four times, all for preseason physicals.

31.     During every physical, Anderson put on gloves and inserted his fingers into Christian's rectum. Anderson then moved his fingers around and applied pressure until the sensation was painful.

32.     Christian has never received any education, training, or work experience in the medical field. To this day he does not understand what examination techniques, tests, or procedures are medically necessary, proper, or ethical when a doctor is performing a physical on a college-aged athlete.

33.     Christian does not know the standard of care for physicians performing physical exams on males. Christian is not competent to judge whether a digital rectal exam should even be part of a physical exam, nor is he competent to give opinion testimony on the issue.

34.     Christian has no specialized education, training, or experience that would give him a reasonable basis for doubting a physician's medical explanation as to why the doctor performed a digital rectal exam on him during a physical.

35. Christian has no specialized education, training, or experience that would give him reason to doubt a physician's medical explanation as to why the physician moved his fingers a certain way while performing a digital rectal exam.

36. When Christian told Anderson that Anderson's finger motions were painful, Anderson told Christian that Christian was actually feeling "pressure" rather than pain.

37. Christian reasonably accepted Dr. Anderson's medical explanation. He had no grounds to challenge it or question its truthfulness. Plus, Christian was taught to trust doctors, and Michigan encouraged a relationship of trust and confidence between Anderson and the athletes he treated.

38. Christian had no reason to believe it was medically unnecessary or inappropriate for Dr. Anderson to put his fingers inside his rectum. Christian did not know how the sensation of pressure on his prostate was "supposed" to feel, or what (if anything) distinguished a medical description of prostate pressure from prostate pain. Christian understood that lots of medical practices or procedures either hurt or were uncomfortable. Just because Anderson's examination technique hurt, he had no reason to believe it might be improper. Christian worried that perhaps he was more sensitive than the other players who underwent the exam. Christian assumed these rectal exams took place on every college's football team.

39.     It was embarrassing and painful when Dr. Anderson stuck his fingers in Christian's rectum. Christian intensely disliked the experience. But Anderson did not attempt to forcibly hold down Christian or to physically dominate Christian in a way people associate with aggressive or violent behavior. Disliking the experience and how it felt did not give Christian a reason to suspect he was being sexually assaulted. It did not give Christian a reason to suspect he was being raped.

40.     Also, it was well-known that Anderson routinely performed rectal exams during physicals. It seemed like he did it to all Christian's teammates because they joked about it, although perhaps a bit nervously. If such an exam was actually medically improper and a crime, why would it be discussed so openly? Christian did not remotely believe that Dr. Anderson's "rectal examinations" of him were pretextual, that they constituted sexual abuse, or that they constituted rapes under Michigan law.

41.     Christian felt uneasy around Anderson. There was something about Anderson that Christian disliked. But Christian could not pinpoint what it was or why he disliked him.

42.     Disliking Anderson, however, was not a valid reason for Christian to doubt or challenge Anderson's medical practices. Also, the University had hired and assigned Anderson to be the football team's physician, which was an honor. Christian expected the University demanded the same excellence from Anderson

that they demanded from Christian. Christian expected and trusted the University to recruit doctors who were as qualified as the athletes Michigan recruited.

43.     Christian was raised to believe that doctors help their patients, not hurt them.

44.     Before February 20, 2020, Christian did not know Anderson had sexually assaulted him one time, let alone four times. Christian was not aware of prior, credible allegations that Anderson had sexually assaulted other students. Christian did not know that Anderson had been sent to the Athletic Department because a UM administrator learned Anderson was sexually assaulting male students. In short, nothing Anderson did placed Christian on notice that Anderson might have been sexually assaulting him. Likewise, UM did nothing to put Christian on notice that Anderson was a sexual predator.

45.     Before February 20, 2020, Christian had no reason to suspect that one or more UM administrators, who could have instituted corrective measures, knew Anderson was a sexual predator even before Anderson was transferred to the Athletic Department and made team physician for the football team. For decades, UM had kept secret what it knew about Anderson's history of sexual predation.

46.     In February of this year, Christian learned that Anderson's rectal exams were medically unwarranted, improper, and even criminal. Christian also learned that Anderson was a serial sexual offender. Then Christian learned that the

University *knew* Anderson was sexually assaulting male student patients *before* the University transferred Anderson to the Athletic Department, where Anderson ultimately raped Christian and assaulted/raped many other UM athletes.

47.     The University of Michigan showed more than deliberate indifference by placing Christian under Anderson's care. The University betrayed Christian in the most extreme possible manner. If UM had exercised the slightest degree of care for Plaintiffs and other persons on the sports teams Anderson treated, the University never would have exposed Christian or any other Plaintiff to Anderson or any other physician with a history of sexually assaulting his patients.

48.     After Christian graduated and left the University, he avoided getting annual physical exams because the rectal exams were painful. By the time Christian endured another digital rectal exam, which was made necessary due to symptoms associated with pathology of the prostate, he was diagnosed with incurable and inoperable prostate cancer.

49.     John Doe RS-01 is a resident of the State of Wisconsin and a United States citizen.

50.     John Doe RS-01 attended UM as an undergraduate student from 1978 to 1983.

51.     While at UM, John Doe RS-01 played on the Football team.

52.     John Doe RS-01 saw Anderson at least ten times for physicals and other medical conditions.

53.     Anderson sexually assaulted John Doe RS-01 four times.

54.     On each occasion, Anderson inserted his fingers into John Doe RS-01's rectum. On one occasion, Anderson manipulated John Doe RS-01's testicles. Anderson had John Doe RS-01 bend over the exam table and then Anderson reached in between John Doe RS-01's legs grabbing his penis and testicles.

55.     John Doe RS-01 has never received any education, training, or work experience in the medical field. To this day he does not understand what examination techniques, tests, or procedures are medically necessary, proper, or ethical when a doctor is performing a physical on a college-aged athlete.

56.     John Doe RS-01 does not know the standard of care for physicians performing physical exams on males. John Doe RS-01 is not competent to judge whether a physician is performing a physical exam in a competent manner. He is not even competent to know what should or should not be done as part of a physical exam. He is not competent to offer opinion testimony on the issue.

57.     John Doe RS-01 has no specialized education, training, or experience that would give him a reasonable basis for doubting a physician's medical explanation for the techniques used, such as performing a digital rectal exam during a physical.

58.     John Doe RS-01 has no specialized education, training, or experience that would give him reason to doubt a physician's medical explanation as to why the physician examined John Doe RS-01 a certain way, such as the way the physician manipulated John Doe RS-01's testicles or moved his fingers during a rectal exam.

59.     John Doe RS-01 has never received any education, training, or work experience in the medical field. To this day he does not understand what examination techniques, tests, or procedures are medically necessary, proper, or ethical when a doctor is performing a physical on a college-aged athlete.

60.     John Doe RS-01 does not know the standard of care for physicians performing physical exams on males. John Doe RS-01 is not competent to judge whether a physician is performing a physical exam in a competent manner. He is not even competent to know what should or should not be done as part of a physical exam. He is not competent to offer opinion testimony on the issue.

61.     John Doe RS-01 has no specialized education, training, or experience that would give him a reasonable basis for doubting a physician's medical explanation as to why the doctor performed a digital rectal exam or touched his genitals during a physical.

62.     John Doe RS-01 has no specialized education, training, or experience that would give him reason to doubt a physician's medical explanation as to why the physician examined John Doe RS-01 a certain way, such as the way the physician

manipulated John Doe RS-01's penis and testicles or moved his fingers during a rectal exam.

63.    During physicals and medical exams, Anderson inserted fingers into John Doe RS-01's rectum and moved them around, pressing until it hurt. When John Doe RS-01 said it felt painful, Anderson told him the sensation he was feeling was pressure, not pain. John Doe RS-01 accepted Anderson's medical explanation and had no grounds to challenge it. John Doe RS-01 was taught to trust doctors. Anderson made it sound like it was a standard medical procedure. John Doe RS-01 trusted Michigan to put him in the care of a competent doctor who was not a sexual predator.

64.    John Doe RS-01 had no reason to believe it was medically unnecessary or inappropriate for Anderson to put his fingers inside his rectum. John Doe RS-01 did not know how the sensation of pressure on the prostate was "supposed" to feel, or what distinguished a medical description of prostate pressure from prostate pain. John Doe RS-01 expects that lots of medical practices or procedures hurt or are uncomfortable. Just because an examination technique hurts, that is no reason to believe it might be improper. John Doe RS-01 thought these exams took place on every college's football team.

65.    John Doe RS-01 was embarrassed and felt pain when Anderson stuck his fingers his rectum. John Doe RS-01 intensely disliked the experience. But

disliking the experience and how it felt did not give John Doe RS-01 a reason to believe it might be a sexual assault. Also, it was well-known that Anderson routinely performed rectal exams during physicals. It seemed like he did it to all John Doe RS-01's teammates because his teammates joked about it, although perhaps a bit nervously. If such an exam was actually medically improper and a crime, why would it be discussed so openly? John Doe RS-01 did not consider that Anderson's "rectal examinations" of him were pretextual, that they constituted sexual abuse, or that they fit the State of Michigan's definition of a rape.

66.     John Doe RS-01 felt uneasy around Anderson in the examination room. But that was not a valid reason to question Anderson's clinical competence. Plus, the University had hired and assigned Anderson to be the football team's physician, which was an honor. John Doe RS-01 expected the University demanded the same excellence from Anderson that they demanded from John Doe RS-01. And John Doe RS-01 was raised to believe that doctors help their patients, not hurt them.

67.     Before February 20, 2020, John Doe RS-01 did not know Anderson had sexually assaulted him one time, let alone four times. John Doe RS-01 was not aware of prior allegations that Anderson had sexually assaulted. John Doe RS-01 did not know that Anderson had been sent to the Athletic Department because a UM administrator learned Anderson was sexually assaulting male students. In short, nothing Anderson did placed John Doe RS-01 on notice that Anderson might have

been sexually assaulting him. Likewise, UM did nothing to put John Doe RS-01 on notice that Anderson was a sexual predator.

68.    Before February 20, 2020, John Doe RS-01 had no reason to suspect that one or more UM administrators, who could have instituted corrective measures, knew Anderson was a sexual predator before Anderson was transferred to the Athletic Department and made team physician for the football team. For decades, UM had kept secret the fact that Anderson was a sexual predator.

69.    After February 20, 2020, John Doe RS-01 learned that Anderson's rectal exams were medically unwarranted, improper, and even criminal. John Doe RS-01 also learned that Anderson was a serial sexual offender. Then John Doe RS-01 learned that the University *knew* Anderson was sexually assaulting male student patients *before* the University transferred Anderson to the Athletic Department, where Anderson ultimately raped John Doe RS-01 and assaulted/raped many other male UM athletes.

70.    The University of Michigan showed more than deliberate indifference by placing John Doe RS-01 under Anderson's care. The University betrayed John Doe RS-01 in the most extreme possible manner. If UM had exercised the slightest degree of care for Plaintiffs and other persons on the sports teams Anderson treated, the University never would have exposed John Doe RS-01 or any other Plaintiff to Anderson or any other physician with a history of sexually assaulting his patients.

71.     John Doe RS-02 is a resident of the State of Michigan and a United States citizen.

72.     John Doe RS-02 attended UM as an undergraduate student from 1968 to 1972.

73.     While at UM, John Doe RS-02 played on the Football team.

74.     John Doe RS-02 saw Anderson at least ten times for physicals and other medical conditions.

75.     Anderson sexually assaulted John Doe RS-02 at least ten times.

76.     Anderson gave John Doe RS-02 rectal exams and genital exams during when John Doe RS-02 was there to be treated bodily injuries on other areas of his body. During one exam, John Doe RS-02 saw Anderson for a shoulder injury. John Doe RS-02 was fitted with a shoulder harness and Dr. Anderson performed a rectal exam during this visit. Due to the length of time of Anderson's exams, John Doe RS-02 would ask Anderson if there was a problem, because he was afraid that Anderson found something medically wrong with him. Anderson told John Doe RS-02 that there was an issue with the muscle tissue surrounding his scrotum, and that he needed to perform genital exams during future examinations to monitor the condition.

77.     During the exams, Anderson would tell John Doe RS-02 to, "sit still" because the exam would be over soon.

78.     John Doe RS-02 has never received any education, training, or work experience in the medical field. To this day he does not understand what examination techniques, tests, or procedures are medically necessary, proper, or ethical when a doctor is performing a physical on a college-aged athlete.

79.     John Doe RS-02 does not know the standard of care for physicians performing physical exams on males. John Doe RS-02 is not competent to judge whether a physician is performing a physical exam in a competent manner. He is not even competent to know what should or should not be done as part of a physical exam. He is not competent to offer opinion testimony on the issue.

80.     John Doe RS-02 has no specialized education, training, or experience that would give him a reasonable basis for doubting a physician's medical explanation as to why the doctor performed a digital rectal exam on him during a physical.

81.     John Doe RS-02 has no specialized education, training, or experience that would give him reason to doubt a physician's medical explanation as to why the physician examined John Doe RS-02 a certain way, such as the way the physician manipulated John Doe RS-02's penis and testicles or moved his fingers during a rectal exam.

82.     During physicals and medical exams, Anderson inserted fingers into John Doe RS-02's rectum and moved them around, pressing until it hurt. When John

Doe RS-02 said it hurt, Anderson told him the sensation he was feeling was pressure, not pain. John Doe RS-02 accepted Anderson's medical explanation and had no grounds to challenge it. John Doe RS-02 was taught to trust doctors. Anderson made it sound like it was a standard medical procedure. John Doe RS-02 trusted Michigan to put him in the care of a competent doctor who was not a sexual predator.

83.     John Doe RS-02 had no reason to believe it was medically unnecessary or inappropriate for Anderson to put his fingers inside his rectum. John Doe RS-02 did not know how the sensation of pressure on the prostate was "supposed" to feel, or what distinguished a medical description of prostate pressure from prostate pain. John Doe RS-02 expects that lots of medical practices or procedures hurt or are uncomfortable. Just because an examination technique hurts, that is no reason to believe it might be improper. John Doe RS-02 thought these exams took place on every college's football team.

84.     John Doe RS-02 was embarrassed and felt pain when Anderson stuck his fingers his rectum. John Doe RS-02 intensely disliked the experience. But disliking the experience and how it felt did not give John Doe RS-02 a reason to believe it might be a sexual assault. Also, it was well-known that Anderson routinely performed rectal exams during physicals. It seemed like he did it to all John Doe RS-02's teammates because his teammates joked about it, although perhaps a bit nervously. If such an exam was actually medically improper and a crime, why would

it be discussed so openly? John Doe RS-02 did not consider that Anderson's "rectal examinations" of him were pretextual, that they constituted sexual abuse, or that they fit the State of Michigan's definition of a rape.

85.    John Doe RS-02 felt uneasy around Anderson in the examination room. But that was not a basis for questioning Anderson's clinical competence. Plus, the University had hired and assigned Anderson to be the football team's physician, which was an honor. John Doe RS-02 expected the University demanded the same excellence from Anderson that they demanded from John Doe RS-02. And John Doe RS-02 was raised to believe that doctors help their patients, not hurt them.

86.    Before February 20, 2020, John Doe RS-02 did not know Anderson had sexually assaulted him one time, let alone ten times. John Doe RS-02 was not aware of prior allegations that Anderson had sexually assaulted other students. John Doe RS-02 did not know that Anderson had been sent to the Athletic Department because a UM administrator learned Anderson was sexually assaulting male students. In short, nothing Anderson did placed John Doe RS-02 on notice that Anderson might have been sexually assaulting him. Likewise, UM did nothing to put John Doe RS-02 on notice that Anderson was a sexual predator.

87.    Before February 20, 2020, John Doe RS-02 had no reason to suspect that one or more UM administrators, who could have instituted corrective measures, knew Anderson was a sexual predator even before Anderson was transferred to the

Athletic Department and made team physician for the football team. For decades, UM had kept secret the fact that Anderson was a sexual predator.

88.    After February 20, 2020, John Doe RS-02 learned that Anderson's rectal exams were medically unwarranted, improper, and even criminal. John Doe RS-02 also learned that Anderson was a serial sexual offender. Then John Doe RS-02 learned that the University *knew* Anderson was sexually assaulting male student patients *before* the University transferred Anderson to the Athletic Department, where Anderson ultimately raped John Doe RS-02 and assaulted/raped many other male UM athletes.

89.    The University of Michigan showed more than deliberate indifference by placing John Doe RS-02 under Anderson's care. The University betrayed John Doe RS-02 in the most extreme possible manner. If UM had exercised the slightest degree of care for Plaintiffs and other persons on the sports teams Anderson treated, the University never would have exposed John Doe RS-02 or any other Plaintiff to Anderson or any other physician who had a history of sexually assaulting his patients.

### B.    Defendant

90.    Defendant Regents of the University of Michigan ("Regents") is a body corporate, with the right to be sued, vested with the government of the university. M.C.L. § 390.3 and 390.4.

91.     Defendant governs UM.

92.     Defendant sets and approves all public policy at UM, including sex discrimination policy.

93.     Defendant and/or the University receives, and at all relevant times received, federal financial assistance.

94.     Defendant is subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, et seq.

## III.   ADDITIONAL FACTUAL ALLEGATIONS

### A.   Anderson's Career at Michigan and His Pattern of Sexual Predation.

95.     From 1968 until 2003, Anderson was employed by UM as a physician. He treated UM students and student-athletes on UM's campus in Ann Arbor, Michigan.

96.     During his tenure at UM, Anderson held numerous titles, including Director of Health Services, Senior Physician with Health Services, and Athletic Senior Physician.

97.     In his various positions with UM Health Service, Anderson regularly saw male students as patients for general health-related inquiries, medical ailments, physical examinations, and other reasons.

98.     In his role as Athletic Physician, Anderson treated members of the wrestling, football, and hockey teams for nearly every medical ailment, complaint,

and injury as their UM-assigned internist. Michigan designated Anderson as a physician to perform physicals and checkups on UM student-athletes. Every UM athlete was required to undergo – and pass – a physical in order to compete in an intercollegiate sport.

99. Throughout his employment with UM, Anderson sexually assaulted, abused, and molested male students by engaging in nonconsensual harassment, sexual touching, assault, and rape, including but not limited to medically unnecessary genital manipulation and digital anal penetration.

**B. Plaintiffs Trusted UM to Provide Them With Safe and Competent Medical Care.**

100. Physicians hold a relationship of trust and confidence with their patients.

101. Plaintiffs attended UM reasonably expecting that UM would consistently provide them with a safe and supportive environment that would help them perform at their best, academically and athletically.

102. Plaintiffs, who participated on intercollegiate sports teams for UM, trusted that UM would make the safety of its student-athletes a primary concern.

103. Plaintiffs expected and trusted UM to act prudently when selecting, training, and supervising the physicians on its faculty and the physicians who would be providing medical care to them and other University athletes.

104.  Plaintiffs expected and trusted UM to hire physician faculty members who would respect professional ethical guidelines.

105.  Plaintiffs expected and trusted UM to hire physician faculty members who would not sexually harass or assault them.

106.  Plaintiffs expected and trusted UM to regularly and competently evaluate the quality and integrity of the medical services that its physicians, including Anderson, provided to Plaintiffs.

107.  Plaintiffs expected and trusted UM to investigate faithfully all circumstances that indicated a team physician was unfit to treat Plaintiffs, whether due to acts of sexual assault/abuse or incompetence.

108.  Plaintiffs expected and trusted that UM personnel would not hide, fail to disclose, or disregard known circumstances that raised a substantial likelihood Anderson would sexually assault and harass Plaintiffs and other students at UM.

109.  Plaintiffs expected and trusted UM would take steps to protect them from any physician who was suspected of sexually harassing or abusing student patients.

110.  Plaintiffs expected and trusted UM to remove Anderson as a treating physician upon allegations being made that Anderson was sexually assaulting his patients.

111.   Plaintiffs expected and trusted UM, an esteemed institution of higher learning, to seek the truth about Anderson's conduct – wherever the truth led the University.

112.   Plaintiffs expected and trusted UM to discover, confront, and stop any sexual abuse by its physician employees.

113.   At all relevant times, UM has known that doctors enjoy a relationship of trust and confidence with their patients. The University has also known that this trust, and the patient's resulting vulnerability, offers physician sexual offenders unique opportunities to manipulate that trust and explain away sexually abusive behavior. UM has also known at all relevant times that a patient's trust in their doctor, along with the great disparity of medical knowledge between physicians and their patients, makes it far less likely (a) that a patient will question a physician about sexual abuse camouflaged as a medical treatment, or (b) that a doctor's false medical justification for sexually abusive conduct will be rejected by a patient.

C.   **UM Betrayed Plaintiffs' Trust and For Decades Demonstrated a Pattern of Deliberate Indifference to Anderson's Sexual Abuse.**

114.   Throughout Anderson's tenure at UM, beginning in 1968, UM repeatedly received complaints about Anderson's sexual misconduct and predation. But UM concealed and intentionally turned a blind eye to Anderson's prolific sexual misconduct.  It continued to allow Anderson access and opportunity to abuse UM

students until he voluntarily retired in 2003. In so doing, UM put its own reputation above the safety of its students.

115.  UM showed deliberate indifference to complaints about Anderson's misconduct.

116.  In 1968, a then-UM student, Gary Bailey, went for an examination by Anderson, which he later described to the Detroit News as "very traumatic."[1]

117.  Bailey states, "he (Anderson) had me drop my pants, he felt my penis and genitals, and subsequently, he (Anderson) wanted me to feel his (Anderson's) penis and genitals." Bailey further states, "Back then you did not question a doctor's authority . . . He asked me to pull on his penis."[2]

118.  Bailey filed a written complaint with the UM Health Service and filled out a form, complaining that Anderson had dropped his pants and asked Bailey to fondle his genitals during the exam.

119.  No one from UM Health Services or any other UM department followed up with Bailey or contacted him as part of an investigation into Bailey's written sexual assault complaint.

---

[1] Kim Kozlowski, *Alum Says He Told UM Of Doctor's Sex Abuse In '68 But Never Got A Response*, THE DETROIT NEWS (last visited April 3, 2020), https://www.detroitnews.com/story/news/local/michigan/2020/02/20/alum-says-he-told-university-michigan-about-doctor-sex-abuse/4817480002/.  Exhibit A.
[2] Id.

120.   On information and belief, UM never acted on and/or investigated Bailey's complaint against Anderson.

121.   Bailey's complaint made Michigan aware of circumstances that would cause a reasonable person to believe there was a substantial likelihood that Anderson would sexually assault his patients if allowed to continue treating students before a thorough and complete investigation of Bailey's complete was completed.

122.   In 1975, UM student and scholarship member of UM's wrestling team, Tad Deluca, gave notice of Anderson's sexual misconduct in a nine-page letter to UM's head wrestling coach, Bill Johannesen, complaining that "Something [was] wrong with [Anderson]" and "[r]egardless of what you are there for, Dr. Anderson makes you drop your drawers."[3]

123.   Neither UM, Coach Johannesen, nor any agents of UM investigated Deluca's complaints about Anderson's sexual assaults; instead Defendant retaliated against Deluca by stripping him of his athletic scholarship and kicked him off the wrestling team.

---

[3] David Jesse, *Former U-M Wrestler: I blew whistle on U-M doctor in 1975, was dismissed from team*, DETROIT FREE PRESS (last visited April 3, 2020), https://www.freep.com/story/news/education/2020/02/27/robert-anderson-university-of-michigan-tad-deluca-sex-abuse-scandal/4890575002/, Exhibit B.

124.   Deluca appealed to then Athletic Director, Don Canham, and provided him with a copy of the letter sent to Coach Johannesen, giving Director Canham notice of the allegations against Anderson.

125.   Director Canham did not investigate the sexual abuse allegation against Anderson, and instead, upheld the revocation of Deluca's athletic scholarship.

126.   Deluca had to hire an attorney and appeal to UM's Board of Intercollegiate Athletics to have his scholarship reinstated.

127.   Johannesen admits to hearing jokes about Anderson's proclivity to "examine" the genitals of male student-athletes. According to Johannesen, "[t]he joke was that you go to see [Anderson], and you have a sore elbow, he would say, 'OK, pull your pants down.'"[4]

128.   In fact, Anderson performed so many rectal exams the athletes nicknamed him "Dr. Drop Your Drawers."[5]

---

[4] Kim Kozlowski, *Ex-Wrestler Says UM Ignored His Abuse Claims, Kicked Him Off Team*, THE DETROIT NEWS (last visited April 3, 2020), https://www.detroitnews.com/story/news/local/michigan/2020/02/27/former-university-michigan-athletes-abuse-allegations-robert-anderson/4869148002/, Exhibit C.
[5] Kim Kozlowski, *UM Official 'Fired' Doctor Accused Of Sex Abuse, But He Stayed On Another 24 Years*, THE DETROIT NEWS (last visited April 3, 2020), https://www.detroitnews.com/story/news/local/michigan/2020/02/21/michigan-doctor-fired-sex-abuse-served-football-team-doctor-24-more-years/4835017002/., Exhibit D.

129.   On information and belief, also in 1975, a then-graduate student was sexually abused by Anderson and complained to UM staff. The student saw Anderson at UM Health Services and during the course of his visit, Anderson inserted his fingers into the student's rectum without medical purpose. The student complained loudly to the desk clerk and an administrator, both of whom dismissed him and ordered a security guard to escort him out of UM Health Services. On information and belief, UM chose not to investigate the student's allegation against Anderson.

130.   In 1979, University activists approached the UM Vice President of Student Life, Tom Easthope, and told Easthope that Anderson had sexually assaulted several members of the gay community at UM during medical examinations.[6]

131.   Easthope found these allegations entirely credible and resolved to fire Anderson immediately. Easthope walked directly to Health Services to fire Anderson. Easthope confronted Anderson for "fooling around" with male students in exam rooms. Anderson did not deny the allegations.[7]

132.   Easthope initially told detectives that he fired Anderson "on the spot." Later, however, Easthope said he may have allowed Anderson to resign. Easthope also referred to Anderson as "Dr. Drop Your Drawers."[8]

---

[6] Exhibit D.

[7] *Id.*

[8] *Id.*

133.   Easthope believed that Anderson had left UM and returned to private practice.[9]

134.   UM did not fire Anderson, however.  Rather, it reassigned him from Director of Health Services to a position as Senior Physician with Health Services, effective January 14, 1980.

135.   Anderson was never fired from UM and remained continuously employed at the University until he retired in 2003.

136.   Anderson's new position, effective January 14, 1980, made him directly responsible for providing clinical medical services to members of UM's intercollegiate sports teams, including the football, wrestling, and hockey teams.

137.   On information and belief, after Anderson's transfer from UM Health Services Director, Athletic Director Canham arranged to increase Anderson's role in the Athletic Department.

138.   On information and belief, Athletic Director Canham was the same person who had chosen not to investigate allegations about Anderson's sexual misconduct that DeLuca had raised in 1975.

139.   Athletic Director Canham was someone with authority to implement corrective measures and to prevent Anderson from continuing to sexually abuse UM students.

---

[9] *Id.*

140.   UM showed deliberate indifference to all the allegations of sexual abuse and Anderson's failure to deny Easthope's accusation that Anderson had "fooled around" with his male patients in his examination room.

141.   UM did not investigate allegations of Anderson's sexual misconduct until 2018.

142.   Despite UM's knowledge of Anderson's misconduct, it continued to hold him out as a leader in its healthcare community. Indeed, UM fraudulently concealed its knowledge of Anderson's predatory sexual misconduct by intentionally recording into a public record a false reason for Anderson's departure as Director of UM Health Services.

143.   UM also praised Anderson in its publication, Volume III of the President's Report of The University of Michigan for 1979–1980.[10]

144.   The UM publication states in its "Acknowledgement" preface: "The University Health Service staff wish to acknowledge the 11 years of leadership provided by Robert E. Anderson, M.D. In January of 1980, Anderson resigned as Director of the University Health Service to devote more time to his clinical field of urology/andrology and athletic medicine . . . his many contributions to health care are acknowledged. . . . The University Health Service staff wish to thank Anderson

---

[10] Excerpts from *President's Report of The University of Michigan*, Vol. III, (1979–1980), Exhibit E at 16.

for his years of leadership and to dedicate the Annual Report to him." It further confirms that after his transfer, Anderson "continue[d] as a senior physician on the medical staff" at UM.[11]

145.   Anderson henceforth had free rein to abuse thousands of male UM athletes with impunity, including Plaintiffs.

146.   Even upon learning of more allegations, UM continued to protect Anderson and its own reputation instead of the safety of its students.

147.   In 1994, the predecessor of Michigan's Department of Licensing and Regulatory Affairs ("LARA") received a complaint about a 1973 incident, where Anderson fondled the genitals of an undergraduate man to the point of ejaculation. In the ordinary course of a reported sexual assault by a regulated professional, LARA would have contacted UM as Anderson's employer.  On information and belief, UM did not investigate or discipline Anderson in connection with the LARA 1973 incident.

### D.   Plaintiffs Reasonably Failed to Understand Anderson had Sexually Assaulted Them.

148.   At the time Plaintiffs were assaulted, they did not understand they were victims of sexual assault.   While they found Anderson's examinations to be uncomfortable, painful, embarrassing, or perhaps violating, they had no ability to

---

[11] Id.

judge whether Anderson's actions and were either medically justified or appropriate. When asked, Anderson offered plausible medical explanations for how and why he was touching them. For example, when he raped Plaintiffs by inserting his fingers into their rectums, Plaintiffs had no basis for doubting the legitimacy of his prostate check explanation. Plaintiffs did not know the American College of Internal Medicine guidelines regarding the age at which patients should have a digital rectal exam as part of a physical examination. Plaintiffs did not know the proper technique for performing a digital rectal exam. Plaintiffs had no basis for believing their feelings were the result of Anderson's improprieties rather than Plaintiffs' pre-existing fears or sense of modesty.

149.   In its Motion to Dismiss in case Case 2:20-cv-10568-PDB-EAS (ECF No. 21), Michigan argues the Plaintiffs' subjective feelings would have placed a reasonable person on inquiry notice that Anderson was sexually abusing them. This "blame the victim" argument is more than highly offensive; it exposes UM's effort to avoid the practical and legal effects of the confidential relationship between Anderson and his patients. It also exposes UM's refusal to acknowledge the vast disparity in knowledge between Anderson and the Plaintiffs in Anderson's examination room.

150.   Plaintiffs in this case were no more able to see through Anderson's masquerade of examination techniques, or his medical terminology subterfuge

explanations, than Anderson would have been able to tell Plaintiffs were lying to him if they told him that "Spread Right, Jet Motion, X-Ray 37, Fly PO on 2" was a real Michigan play.

151.   Plaintiffs were vulnerable to Anderson's sexual abuse and were not able to identify Anderson's conduct as sexual abuse when it occurred. Plaintiffs have already stated sufficient facts to show they reasonably failed to understand Anderson was sexually assaulting them. Other facts that would have helped deceive any reasonable person from believing they were being sexually abused are set forth below.

152.   All the Plaintiffs had to pass a team physical in order to participate in their sport.   Plaintiffs assumed Anderson's methods were standard procedure because other teammates reported undergoing the same rectal examination.

153.   Plaintiffs came into contact with Anderson under legitimate circumstances in a professional setting and were inclined to interpret what took place in the examination room within that framework of legitimacy.

154.   When Anderson abused Plaintiffs, male sexual abuse was not a commonly acknowledged problem or a topic discussed outside educational and therapeutic settings.

155.   Like most persons, Plaintiffs were brought up to believe that doctors are trustworthy and do not intentionally hurt their patients.

156.   Like most persons, Plaintiffs were brought up to believe that a "good" patient is a compliant patient.

157.   Like most persons, Plaintiffs treated by Anderson were placed in a vulnerable position, both physically and psychologically, when Anderson examined them. They were not psychologically predisposed to question Anderson's clinical practices.

158.   Like most patients, there was a huge disparity between Anderson's medical knowledge and the Plaintiffs. They had no standing to challenge his explanations for the things he did to them.

159.   Plaintiffs were on Anderson's "turf" when he examined them in his office. Anderson's psychological and educational advantage over Plaintiff athletes in the examination room was just as great as Plaintiffs' physical advantage over Anderson would have been on the playing field.

160.   Like most patients, Plaintiffs went into exams, particularly pre-season physicals, expecting physical contact with the doctor.  Plaintiffs had neither the experience nor education to know the limits of appropriate physical contact during medical examinations.

161.   Like most patients, Plaintiffs believed their doctor would give them truthful information so they could consent to being treated.

162.   Like most patients, Plaintiffs entered examination rooms presuming that what went took place in a doctor's office was supposed to be confidential. Even under the most normal circumstances, Plaintiffs wanted their genital or rectal examinations to remain confidential because the such topics were embarrassing to discuss. To the extent that Anderson's examinations felt aggressive or prolonged, it was reasonable for Plaintiffs, like most patients, to attribute such perceptions to the patient's own subjective sense of modesty, shyness, or naivete. The alternative was to conclude that a renowned physician and career UM employee who was doing the same thing to the patient's teammates was a sexual predator.

163.   Plaintiffs who were student-athletes maintained a special relationship with UM because they were attending on athletic scholarships. Many needed their athletic scholarship to stay in school.  If Anderson failed them during a physical, they would not be allowed to play their sport

164.   Plaintiffs were expected to maintain a team mentality at all times. UM encouraged its athletes to sacrifice themselves for the good of the team. No teammate wanted to complain about something he understood his teammates were also having to endure.

165.   Plaintiffs, as athletes, were expected to be tough and not to complain about situations that were physically or emotionally stressful or painful.

166.   UM controlled every aspect of how Anderson interacted with the Plaintiffs. UM provided the facilities, designated Anderson as their doctor, and controlled scholarships. Plaintiffs had no say in who treated them.

167.   None of the Plaintiffs had/have received medical education or training, so they had/have no knowledge of medical examination techniques for diagnosing or treating any conditions, such as hernias, swollen lymph nodes, hamstring tears, or medical conditions of the penis, testicles, rectum, prostate, or anus.

168.   None of the Plaintiffs have ever been trained or educated as to when it is medically appropriate for a doctor to perform a prostate exam.

169.   None of the Plaintiffs have been trained or educated as to what constitutes inappropriate physical conduct in the context of a doctor-patient relationship.

170.   None of the Plaintiffs have ever been educated or trained regarding what comments or questions are inappropriate for a physician to make during a medical examination.

171.

172.   Regardless of how Plaintiffs felt about Anderson, Plaintiffs also understood their feelings were not facts. Plaintiffs did not have an objective factual basis for investigating whether they were sexually assaulted, or whether UM had

known Anderson was a sexual predator, until news reports surfaced about Anderson in February 2020.

**D.     Prior to February 2020, Anderson's Victims Did Not Know, and Could Not Reasonably Known, that UM had Actively Concealed and Been Deliberately Indifferent to Anderson's Pattern of Sexually Assaulting Male UM Students and Student-Athletes.**

173.   UM independently harmed Plaintiffs by failing to protect them from Anderson despite having actual knowledge of facts that made it substantially likely Anderson was a sexual predator. Not until within the past two years would Plaintiffs' due diligence have allowed them to reasonably infer: (a) what UM knew about Anderson while Anderson was on the faculty; or (b) what UM did or failed to do with that information.

174.   Until February 20, 2020, Plaintiffs did not know, and could not have reasonably inferred, that UM was aware of Anderson's history of sexual abuse and sexual harassment.  UM kept secret all complaints about Anderson.  To Plaintiffs, it was unthinkable that UM would have allowed Anderson to treat them and other male UM patients if UM had known Anderson was a sexual predator.

175.   To Plaintiffs, it was inconceivable that the University they loved would betray them by transferring a presumed sexual predator to a position that would place them directly in line to be his next victims.

**E.     UM Fraudulently Concealed It's Deliberate Indifference to Anderson's Sexual Misconduct.**

176.   UM, through its employees, agents, and representatives, including but not limited to administrators, athletic directors and assistant athletic directors, athletic coaches, trainers, and directors, fraudulently concealed its knowledge of and deliberate indifference towards Anderson's established pattern of sexually assaulting male patients by (1) keeping secret the many complaints UM had received about Anderson's history of sexual assault; (2) failing to notify law enforcement of Anderson's behavior and the numerous complaints regarding his behavior; (3) placing Anderson in a position where continuation of his sexual assaults upon Plaintiffs and other male UM student-athletes was a virtual certainty; (4) misrepresenting, both expressly and impliedly, that Anderson's examination methods with Plaintiffs and other male student-athletes were normal clinical behavior or medically necessary; (5) referencing Anderson's medical credentials and reputation as a way to discount and disregard complaints about Anderson's sexual assaults, so that the persons who made the complaints would be made to feel realize they were medically unqualified to question whether Anderson's examination methods were within the standard of care for such examinations; and (6) publicly praising Anderson for his distinguished contributions to the University while transferring him to another position because he had sexually assaulted many of his male patients.

177.   UM entered into a contractual relationship with Plaintiffs through the athletic scholarships they awarded Plaintiffs. UM owed Plaintiffs an implied duty of good faith and fair dealing due to the scholarships. This bestowed on UM an affirmative duty to disclose credible allegations about Anderson's sexual predation, particularly if UM intended to allow Anderson to continue treating Plaintiffs and other students.

178.   UM knowingly placed Plaintiffs in a relationship of trust and confidence with Anderson. Once UM became aware of credible allegations that Anderson had sexually abused patients, UM owed Plaintiffs an affirmative  duty to disclose those allegations to Plaintiffs. UM betrayed and showed deliberate indifference towards Plaintiffs by allowing them to continue seeing Anderson believing that Anderson was a legitimate and trustworthy physician.

179.   UM falsely represented to Plaintiffs that Anderson was practicing ethical medicine by failing to disclose what it knew about the propriety of digital penetration during physical exams of young males. UM

180.   UM falsely represented to Plaintiffs that Anderson was practicing ethical medicine by failing to disclose the credible allegations made against Anderson.

181.   UM's false representations and omissions were material when made.

182.   Plaintiffs relied on UM's false representations and omissions. Plaintiffs would never have agreed to be treated by Anderson if they were aware of the allegations against him or the fact that digital penetration was completely inappropriate during their physical examinations.

183.   UM intentionally withheld from Plaintiffs information UM knew about Anderson's history of sexually abusing male students.  If Plaintiffs had known this information, they would not have consented to Anderson treating them.

184.   UM's false representations and omissions were intended to deceive Plaintiffs into believing they had not been sexually abused. UM did not want Plaintiffs to bring suit. UM also did not want allegations about sexual abuse by an Athletic Department physician to hurt UM's recruitment of future athletes (whom UM also directed to Anderson's care).

185.   Plaintiffs did, in fact, rely on UM's express and implied misrepresentations and omissions; indeed, UM's misrepresentations and omissions led Plaintiffs to continue seeking treatment from Anderson.

186.   Plaintiffs' also detrimentally relied on UM's failure to disclose information about Anderson's sexual abuse history that was necessary for Plaintiffs to make an informed consent about whether to be treated by Anderson.

187. Plaintiffs could not give consent to having Anderson treat them due to UM's failure to disclose such critical, material information regarding Anderson's history of sexually abusing his male patients.

## IV. CLAIM FOR RELIEF

### COUNT I: VIOLATION OF TITLE IX
### 20 U.S.C. § 1681(a), *et seq.*

188. Plaintiffs incorporate by reference all preceding paragraphs of the Complaint as if fully restated in this paragraph.

189. Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."

190. Title IX is implemented through the Code of Federal Regulations. See 34 C.F.R. Part 106. 34 C.F.R. § 106.8(b) provides: ". . . A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part."

191. At all relevant times, UM received federal financial assistance and is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, et seq.

192.   Sexual harassment of students is a form of sex discrimination covered by Title IX.

193.   Sexual harassment is unwelcome conduct of a sexual nature, including unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.

194.   Title IX covers all programs of a school that receives any federal financial assistance, and covers sexual harassment—including sexual assault—by school employees, students, and third parties.

195.   Title IX required UM to promptly investigate all allegations of sexual harassment, including sexual assault and abuse.

196.   UM is responsible for setting and approving all public policy at UM, including sex discrimination policy.

197.   At all times relevant to Plaintiffs' claims, Plaintiffs saw Anderson while he was acting in his capacity as a UM athletic team physician and UM employee.

198.   Anderson's sexual harassment and sexual assaults of Plaintiffs constituted sexual harassment under Title IX.

199.   UM knew Anderson was a serial sexual predator when Anderson sexually assaulted and/or harassed each of the Plaintiffs.

200.   UM's failure to respond promptly and adequately to allegations of Anderson's abuse constituted sex discrimination in violation of Title IX.

201.    Employees and agents of UM, who had authority to institute corrective measures regarding Anderson's sexual assault and harassment of Plaintiffs and other male UM students and student-athletes, knew there was a substantial or high likelihood that Anderson was a serial sexual predator and that Anderson was sexually assaulting and harassing male UM students and student-athletes, including Plaintiffs.  Such UM personnel included but were not limited to Athletic Directors and Assistant Athletic Directors, high level administrators, coaches, and numerous team physicians.

202.    Before Anderson sexually harassed Plaintiffs, persons within UM with the authority to institute corrective action had actual knowledge of the substantial risk that Anderson would sexually assault and/or harass male students at UM.

203.    Despite having such knowledge, UM personnel in a position to institute corrective action failed to take reasonable steps to protect Plaintiffs and other male UM student-athletes from Anderson's sexually predatory conduct.

204.    UM showed deliberate indifference towards the threat Anderson posed to Plaintiffs and his other patients by, among other things:

    a.  Ignoring and denying allegations of Anderson' sexual assault and harassment;

    b.  Minimizing and normalizing Anderson's examination practices instead of confronting them;

c. Failing to promptly and adequately investigate allegations of Anderson's sexual assault and harassment;

d. Failing to respond to complaints of Anderson's sexual harassment that Easthope deemed serious and credible;

e. Requiring male athletes to see Anderson for annual physicals and medical treatment, despite numerous prior complaints about Anderson's sexual assault and harassment of male students and Anderson's reputation for insisting upon conducting purported prostate exams when there was no legitimate reason for him doing so;

f. Failing to discharge or adequately supervise Anderson after learning that he posed a substantial risk to the safety of male students and student-athletes;

g. Failing to notify law enforcement about allegations and complaints that Anderson had committed criminal acts;

h. Punishing individuals who complained about Anderson's sexual assaults or harassment;

i. Putting their concern for UM's reputation and future athletic recruitment before their concern for the victims of Anderson's sexual assaults;

j.  Publicly promoting Anderson as an upstanding member of the University community;

k.  Failing to report student complaints about Anderson's sexual assault and sexual harassment of male UM students to the State of Michigan's medical board;

l.  Protecting and preserving Anderson's professional reputation by transferring him to practice medicine for the Athletics Department rather than initiating many other correction actions that would have prevented him from sexually assaulting more students;

m.  Minimizing Anderson's sexually predatory conduct by joking about it; and

n.  Failing to have in place an effective sexual harassment policy that would have required UM to address and investigate students' complaints about Anderson's sexual assaults and harassment in a meaningful way.

205.  UM's deliberate indifference substantially increased the likelihood that Plaintiffs and other students would be sexually harassed or assaulted.

206.  As a direct and/or proximate result of UM's deliberate indifference and intentional misconduct, Plaintiffs were damaged and continue to suffer damages.

207.   The sexual harassment Plaintiffs suffered was so severe, pervasive, and objectively offensive that it deprived Plaintiffs of access to educational opportunities and benefits, including a safe educational environment and appropriate medical care.

208.   In subjecting Plaintiffs to the wrongful treatment herein described, and through its violations of Title IX, Michigan acted willfully and maliciously, with the intent to harm Plaintiffs, and with conscious and willful disregard of Plaintiffs rights, so as to constitute malice and oppression. Plaintiffs are therefore entitled to the recovery of punitive damages, in an amount to be determined by the court, against Defendant, in a sum to be shown according to proof.

209.   Plaintiffs seek an award of attorney's fees under 42 U.S.C. § 1988(b).

WHEREFORE, Plaintiffs respectfully request that this Court:

(a)     Enter judgment in favor of Plaintiffs on Count I under Title IX against Defendant;

(b)     Award Plaintiffs compensatory damages in amounts to be established at trial, including, without limitation, payment of Plaintiffs' medical and other expenses incurred as a consequence of the sexual abuse and/or harassment and UM's deliberate indifference; damages for deprivation of equal access to the educational opportunities and benefits provided by UM; and damages for past, present and future emotional pain and suffering, ongoing mental anguish, loss of

past, present and future enjoyment of life, lost life expectancy, and loss of future

earnings and earning capacity;

      (c)     Award Plaintiffs punitive damages against Defendant;

      (d)     Award Plaintiffs pre-judgment and post-judgment interest;

      (e)     Award Plaintiffs their court costs and expenses, including attorney's

fees, pursuant to 42 U.S.C. § 1988(b); and

      (f)  Grant such other relief as this Court deems just and proper.

Respectfully submitted,

*/s/ Richard W. Schulte*
Richard W. Schulte (OH # 0066030)
Wright & Schulte, LLC
865 S. Dixie Dr.
Vandalia, OH 45377
(937) 435-7500
(937) 435-7511 facsimile
rschulte@yourlegalhelp.com

*/s/ Michael L. Wright*
Michael L. Wright (OH # 0067698)
(*pro hac vice* to be applied for)
Wright & Schulte, LLC
130 W. 2nd Street, Suite 1600
Dayton, OH 45402
(937) 222-7477
(937) 222-7911 facsimile
mwright@yourohiolegalhelp.com

Dated: May 22, 2020

*/s/ Dennis P. Mulvihill*
Dennis P. Mulvihill (OH # 0063996)
(*pro hac vice* to be applied for)
Wright & Schulte, LLC
23240 Chagrin Blvd., Suite 620
Cleveland, OH 44122-5468
(216) 591-0133
(216) 591-0622 facsimile
dmulvihill@yourlegalhelp.com

*/s/ Warren N. Sams, III*
Warren N. Sams, III (GA # 624440)
(*pro hac vice* to be applied for)
The Sams Law Firm
1000 Parkwood Circle, SE, Suite 220
Atlanta, GA 30339
(404) 420-0291
(404) 420-0294 facsimile
wsams@samslaw.net

*Counsel for Plaintiffs*

Dated: May 22, 2020

## JURY DEMAND

Plaintiffs, by and through their attorneys, Richard W. Schulte, Michael L. Wright, Dennis P. Mulvihill, and Wright & Schulte, LLC, as well as Warren N. Sams, III and The Sams Law Firm hereby demand a trial by jury on all claims set forth above.

Respectfully submitted,

*/s/ Richard W. Schulte*
Richard W. Schulte (OH # 0066030)
Wright & Schulte, LLC
865 S. Dixie Dr.
Vandalia, OH 45377
(937) 435-7500
(937) 435-7511 facsimile
rschulte@yourlegalhelp.com

*/s/ Michael L. Wright*
Michael L. Wright (OH # 0067698)
(*pro hac vice* to be applied for)
Wright & Schulte, LLC
130 W. 2nd Street, Suite 1600
Dayton, OH 45402
(937) 222-7477
(937) 222-7911 facsimile
mwright@yourohiolegalhelp.com

Dated: May 22, 2020

*/s/ Dennis P. Mulvihill*
Dennis P. Mulvihill (OH # 0063996)
(*pro hac vice* to be applied for)
Wright & Schulte, LLC
23240 Chagrin Blvd., Suite 620
Cleveland, OH 44122-5468
(216) 591-0133
(216) 591-0622 facsimile
dmulvihill@yourlegalhelp.com

*/s/ Warren N. Sams, III*
Warren N. Sams, III (GA # 624440)
(*pro hac vice* to be applied for)
The Sams Law Firm
1000 Parkwood Circle, SE, Suite 220
Atlanta, GA 30339
(404) 420-0291
(404) 420-0294 facsimile
wsams@samslaw.net

*Counsel for Plaintiffs*

Dated: May 22, 2020